AO 472 (Rev. 11/16) Order of Detention Pending Trial

United States District Court
Southern District of Texas

**ENTERED**
December 05, 2019
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
для
Southern District of Texas

| | |
|---|---|
| United States of America ) | |
| v. ) | |
| ) | Case No. 4:09-cr-342 |
| Leroy King ) | |
| *Defendant* ) | |

## ORDER OF DETENTION PENDING TRIAL

### Part I - Eligibility for Detention

Upon the

☐ Motion of the Government attorney pursuant to 18 U.S.C. § 3142(f)(1), or

☒ Motion of the Government or Court's own motion pursuant to 18 U.S.C. § 3142(f)(2),

the Court held a detention hearing and found that detention is warranted. This order sets forth the Court's findings of fact and conclusions of law, as required by 18 U.S.C. § 3142(i), in addition to any other findings made at the hearing.

### Part II - Findings of Fact and Law as to Presumptions under § 3142(e)

☐ **A. Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(2)** *(previous violator)*: There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person and the community because the following conditions have been met:

☐ **(1)** the defendant is charged with one of the following crimes described in 18 U.S.C. § 3142(f)(1):

☐ **(a)** a crime of violence, a violation of 18 U.S.C. § 1591, or an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed; **or**

☐ **(b)** an offense for which the maximum sentence is life imprisonment or death; **or**

☐ **(c)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508); **or**

☐ **(d)** any felony if such person has been convicted of two or more offenses described in subparagraphs (a) through (c) of this paragraph, or two or more State or local offenses that would have been offenses described in subparagraphs (a) through (c) of this paragraph if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses; **or**

☐ **(e)** any felony that is not otherwise a crime of violence but involves:
**(i)** a minor victim; **(ii)** the possession of a firearm or destructive device (as defined in 18 U.S.C. § 921);
**(iii)** any other dangerous weapon; or **(iv)** a failure to register under 18 U.S.C. § 2250; **and**

☐ **(2)** the defendant has previously been convicted of a Federal offense that is described in 18 U.S.C. § 3142(f)(1), or of a State or local offense that would have been such an offense if a circumstance giving rise to Federal jurisdiction had existed; **and**

☐ **(3)** the offense described in paragraph (2) above for which the defendant has been convicted was committed while the defendant was on release pending trial for a Federal, State, or local offense; **and**

☐ **(4)** a period of not more than five years has elapsed since the date of conviction, or the release of the

defendant from imprisonment, for the offense described in paragraph (2) above, whichever is later.

☐ **B. Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(3)** *(narcotics, firearm, other offenses)*: There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community because there is probable cause to believe that the defendant committed one or more of the following offenses:

☐ **(1)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508);

☐ **(2)** an offense under 18 U.S.C. §§ 924(c), 956(a), or 2332b;

☐ **(3)** an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

☐ **(4)** an offense under Chapter 77 of Title 18, U.S.C. (18 U.S.C. §§ 1581-1597) for which a maximum term of imprisonment of 20 years or more is prescribed; **or**

☐ **(5)** an offense involving a minor victim under 18 U.S.C. §§ 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425.

☐ **C. Conclusions Regarding Applicability of Any Presumption Established Above**

☐ The defendant has not introduced sufficient evidence to rebut the presumption above, and detention is ordered on that basis. *(Part III need not be completed.)*

**OR**

☐ The defendant has presented evidence sufficient to rebut the presumption, but after considering the presumption and the other factors discussed below, detention is warranted.

**Part III - Analysis and Statement of the Reasons for Detention**

After considering the factors set forth in 18 U.S.C. § 3142(g) and the information presented at the detention hearing, the Court concludes that the defendant must be detained pending trial because the Government has proven:

☐ By clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community.

☒ By a preponderance of evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required.

In addition to any findings made on the record at the hearing, the reasons for detention include the following:

☒ Weight of evidence against the defendant is strong
☒ Subject to lengthy period of incarceration if convicted
☐ Prior criminal history
☐ Participation in criminal activity while on probation, parole, or supervision
☐ History of violence or use of weapons
☐ History of alcohol or substance abuse
☐ Lack of stable employment
☐ Lack of stable residence
☐ Lack of financially responsible sureties

☒ Lack of significant community or family ties to this district
☒ Significant family or other ties outside the United States
☐ Lack of legal status in the United States
☐ Subject to removal or deportation after serving any period of incarceration
☐ Prior failure to appear in court as ordered
☐ Prior attempt(s) to evade law enforcement
☐ Use of alias(es) or false documents
☐ Background information unknown or unverified
☐ Prior violations of probation, parole, or supervised release

OTHER REASONS OR FURTHER EXPLANATION:
Evidence Presented

On December 4, 2019, the Court held a hearing to determine whether Defendant Leroy King should be held in custody pending trial in accordance with the Bail Reform Act of 1984, 18 U.S.C. § 3142(f). At the time of his arrest, the Grand Jury had returned an Indictment against Defendant, and Co-Defendants, Robert Allen Stanford, Laura Pendergest-Holt, Gilberto Lopez and Mark Kuhrt. The Grand Jury has charged Defendant in 21 counts with conspiracy to commit mail, wire, and securities fraud in violation of 18 U.S.C. § 371; wire fraud in violation of 18 U.S.C. § 1343; mail fraud in violation of 18 U.S.C. § 1341; conspiracy to obstruct an SEC proceeding in violation of 18 U.S.C. § 371; obstruction of an SEC proceeding in violation of 18 U.S.C. § 1505; and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). Assistant United States Attorney John Pearson appeared on behalf of the United States (the "Government"); Mark Carter appeared on behalf of Defendant.

Defendant's Background

Pretrial Services ("PTS") interviewed Defendant and prepared a report. Defendant is 73 years old, born in St. John's, Antigua and Barbuda. Defendant came to New York in 1972 as a student. He has dual citizenship with the United States, having become a naturalized citizen in 1981. He has two passports that have not been turned over and are in Antigua. He claims they are both expired. In 1994, he returned to Antigua to work for the government. He is divorced, has three children living in New York, and his fiancé lives in Antigua. He owns a home in Antigua.

Defendant has no prior criminal history. He has been retired for 10 years. He currently has cancer and requires medical care.

Evidence Regarding the Pending Complaint

At the hearing, the Government offered testimony of a Special Agent ("SA") of the Internal Revenue Service ("IRS") who is also a Taskforce Officer with the Federal Bureau of Investigation ("FBI"), concerning the criminal investigation and Defendant's subsequent arrest. The Court finds the SA's testimony to be credible. He testified to the following:

In 2008, the IRS and FBI began working on a criminal investigation into a complaint regarding the Stanford Financial Group ("Group") and the Stanford International Bank ("Bank"). During the investigation, Defendant came to their attention. Robert Allen Stanford ("Stanford") was the owner and Chairman of Group, which was his umbrella company for his investment operations. Under that umbrella company, he had various other businesses, including Bank, which was a subsidiary. During the relevant time period, Bank was based in St. Johns, Antigua.

In 2005, the SEC began a civil investigation before this criminal investigation was started. The SEC had also received complaints about Stanford and the Certificate of Deposits ("CDs") offered through the Bank. The SEC conducted a multiyear investigation.

The Government introduced evidence tending to establish that Bank's main investment product were CDs, sold in the United States and worldwide based on fraudulent information. See Gov't Exh. No. 10. Based on misrepresentations regarding the Bank's assets, profits, and oversight from the Antiguan regulators, over $8 billion in CDs were sold between 2002 and 2008. Id. In fact, the investigation revealed that Stanford was operating a massive fraud similar to a Ponzi scheme. Of the more than $8 billion raised for investments, only 8% was invested, or held in cash and cash equivalents. Id. The remaining 92% (over $7 billion) went into Stanford's investment portfolio, which he used to fund his lifestyle. This information was concealed from investors.

The evidence established that, between 2002 and 2008, Defendant was the head of the Antigua Financial Services Regulatory Commission ("FSRC"), responsible for regulating banks, including Bank. During the relevant period, Stanford paid over $520,000 cash in bribes to Defendant for his assistance in the fraudulent scheme. See Gov't Exh. Nos. 1-3. For example, the quarterly reports on its assets and holdings that Bank was required to file with the FSRC were not given scrutiny; these reports were routinely falsified. Gov't Exh. No. 10 ¶ 12. When one FSRC bank examiner asked too many probing questions about the Bank's portfolio, Stanford asked Defendant to have him removed. Id. ¶ 18. Defendant complied. The evidence further established that the SEC confidentially contacted Defendant and the FSRC, asking for assistance with its investigation into Bank. See Gov't Exh. No. 14. In breach of that confidence, Defendant informed Stanford of the investigation and allowed Stanford and his cohorts to draft the responses to the SEC's and other regulators' inquiries. See Gov't Exh. Nos. 6, 8, 9, 9A, & 10 ¶ 19-21. In sum, the evidence established that Defendant was paid cash bribes to turn a blind eye to the Bank's misdeeds and to mislead other regulatory bodies that were investigating Group and Bank.

Once Defendant was no longer in charge of the FSRC, his replacement, Althea Crick, noticed that documents were missing. Specifically, the records were devoid of all the SEC and other regulatory inquiries and FSRC's responses regarding Bank. Ms. Crick asked Defendant if he destroyed the records and he admitted that he did.

In 2009, the SEC filed a civil lawsuit in Dallas. On February 16, 2009, a Receiver was appointed to take over control of the Group's properties and operations. On February 17, 2009, the Receiver and US Marshals went into Group's offices to seize control of its domestic operations.

After the SEC issued subpoenas for Stanford and others to testify, Defendant questioned one of the co-conspirators as to whether the Bank was going to make it. Gov't Exh. No. 10 ¶ 22. Once the SEC's actions were public, Defendant began to remove his money from the United States. On February 22, 2009, he wired $150,000 from his Charles Schwab account to Antigua. On March 6, 2009, he cleaned out the remaining funds in his account, transferring $410,000 to Antigua. Gov't Exh. No. 11.

On June 18, 2009, the Grand Jury returned the criminal indictment in this case. The Defendant was arrested in Antigua and the United States sought his extradition. Defendant fought the extradition for 10 years, filing multiple appeals and ultimately lost. Gov't Exh. No. 12 (Opinion of Antigua's High Court dismissing Defendant's claim for constitutional relief and finding that Defendant abused the process filing multiple appeals). Once his appeals were exhausted, he was arrested and extradited to the United States. The money that Defendant transferred to Antigua was never recovered. SA was not able to trace that money or seize it. In addition, a substantial amount of Stanford's money remains unaccounted for. SA testified that Defendant does not have ties to Houston.

On cross-examination, SA testified that Bank had both internal and external auditors. The internal auditor was a former FSRC bank examiner who was also bribed to be a part of the fraudulent scheme. The external auditor was C.A.S. Hewlett, who was also paid bribes to assist Stanford in carrying out the fraudulent scheme. Stanford paid Hewlett over $4.5 million in bribes, most paid from his secret bank account in Switzerland.

SA also testified that Stanford and his other cohorts had started this fraudulent scheme long before Defendant was head of the FSRC.

Defendant's Evidence

Defendant called four witnesses, his daughter Lorian King, his ex-wife Lisonyi John Diaz, and two friends Kimberly Paul and Richard Allen. All four witnesses testified that Defendant is a peaceful person, religious, and would follow conditions of his release. King, Diaz, and Paul were willing to be a surety on a bond. His daughter testified that her father complied with the conditions of his release in Antigua. His ex-wife, a registered nurse, testified that, while married to Defendant, she moved from Antigua to the United States in 2005 to obtain her RN license. She planned to live in Atlanta with Defendant. He still worked in Antigua when she moved but he visited. He planned to retire at some point and move to the United States. She is his third wife and still lives in Atlanta. His daughter was from the marriage to his first wife and lives in New York. Ms. Diaz testified to Defendant's medical condition. He has prostate cancer, which metastasized from his esophageal cancer. His condition is grave. He has a fiancé in Antigua. Ms. Diaz did not know her. Mr. Allen is a childhood friend of Defendant's from Antigua. They both lived in New York at the same time, but Mr. Allen moved to Houston over 30 years ago and has not kept in touch with Defendant. He was willing to let Defendant live with him if released on bond.

Defendant proffered three exhibits. Def. Exh. No. 1 is a letter from Defendant's doctor in Antigua stating that he has a history of esophageal cancer for which he had surgery. Over the past 10 years, the doctor has been following Defendant for prostate cancer, but he has been neglectful of his condition over the past 3 years and it has gotten worse. Def. Exh. No. 2 is a chart of stages of prostate cancer. Def. Exh. No. 3 is an affidavit from David Dorsett, one of his lawyers in Antigua who represented him in the appeal of the extradition order. Mr. Dorsett testified that Defendant complied with his bail conditions during the pendency of his appeal.

Order

The Grand Jury found probable cause to indict Defendant on the charges. In addition, the Government presented overwhelming documentary evidence and testimony that shows that Defendant has committed the crimes with which he is charged.

In addition, the Government has established by a preponderance of the evidence that the Defendant is a flight risk. First, he is faced with 21 counts that carry significant sentences (approximately 175 years) if he is found guilty, giving him a greater incentive to flee. Defendant has no ties to the community, owns no property here, and has no family here. To the contrary, Defendant emptied his financial accounts in the United States as soon as the SEC filed its case against Stanford and took over the Group property and operations. Defendant has substantial ties outside the United States in Antigua. Defendant was born in and has lived in Antigua since the 1990s, owns a paid off house there, has a fiancé there, and has access to more than $500,000 that he transferred out of the United States. He fought extradition to such an extent that the High Court issued a written opinion noting that he abused the process.

Defendant argues that his compliance with his bond conditions in Antigua is evidence that he can comply with conditions if he were released on these charges. However, the Court finds that he complied with the conditions because it was in his interest to do so. He was fighting extradition and to violate the bail conditions could have harmed his case. At this point, the fact that he is facing a long sentence if convicted and that his co-Defendants have already been tried and sentenced to long prison terms gives him even more incentive to flee.

If the Court were to release Defendant on bond, PTS recommended home detention with a third party custodian, Giselle James. However, Defendant does not have a suitable third-party custodian. His first choice, Ms. James, is a long-time friend who lives in Houston, but she is a likely witness in the case. The person Defendant ultimately relied on, Mr. Allen, has not been in contact with the Defendant for more than 25 years. Mr. Allen was added as a witness at the last minute because he just showed up in Court as a show of support after hearing through other friends that Defendant was facing detention. Without further explanation, he agreed to be Defendant's custodian. The Court does not believe that he can provide the type of supervision the Defendant would require if released. Even if he could, the other factors weigh more heavily against release.

Accordingly, the Court determines that the Defendant is a flight risk such that the Court cannot safely release him on bond.

## Part IV - Directions Regarding Detention

The defendant is remanded to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The defendant must be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility must deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

Date: 12/05/2019

*Dena Palermo*
United States Magistrate Judge